## STATE v. CHRISTOPHER B. SACK.[1]

March 14, 1930.

No. 27,730.

[1]Reported in 229 N. W. 801.

*Albert P. Reed* and *Charles Spillane,* for appellant.

*Henry N. Benson,* Attorney General, *James E. Markham,* Deputy Attorney General, and *H. H. Sturner,* County Attorney, for the state.

WILSON, C. J.

Defendant appealed from an order denying his motion for a new trial. The information charged him with obtaining property by false representations in a way claimed to constitute grand larceny in the first degree within the meaning of G. S. 1923 (2 Mason, 1927) § 10358. He was convicted.

The claim is that he represented lots 4 and 5 in block 4 of Grim's Second Addition to Minneapolis, upon which were located two four-flat, brick apartment buildings and one single stucco dwelling, to be of the value of $55,000; that the apartments and rooms were all in good condition and that the interior had been recently painted and decorated; that the floors and walls were in good condition; that said apartments were all rented at the sum of $50 per month payable in advance and that the tenants had been paying such rent promptly; that such rent was sufficient to pay the interest on

$30,000 unpaid on the contract for deed under which defendant had possession thereof and to make the payments on the principal thereunder and to pay the taxes and upkeep upon said buildings including the heating thereof. It is alleged that all these representations were untrue, that the defendant knew they were false, and that he made them for the purpose of cheating one Harry C. Schwenke, who gave in exchange for the equity in said property his equity in a 160-acre Waseca county farm and personal property thereon.

■ The carrying charges as disclosed by the record were substantially these: monthly payments on the contract, $150; interest which diminishes with time, $150 per month. These payments and interest amount to $3,600 annually. Taxes, $826; fuel estimated, $550; hall lights, $21. There is no evidence as to the cost of insurance, but assuming this expense to be $100 per year we have an annual expense of maintenance of $5,097. Janitor's wages are not included for the reason that defendant was doing that work and it was understood when defendant made the representation that Schwenke planned to do the same work which the defendant had theretofore been doing. Both understood that this item was not included. The record is not satisfactory as to the cost of fuel. The income was $5,400 per year. It is clear therefore that the representation that the property would carry itself was substantially true. This particular representation must therefore drop out of the case.

■ The representation that the apartments were each rented for $50 per month, payable in advance, is sustained by the evidence.

■ The evidence was uncontradicted that the apartments and rooms had been recently painted and decorated. Whether representations that the rooms, walls and floors were in good condition was a matter of opinion and could not be made the basis of fraud we need not stop to consider. Schwenke testified that some of the paper was coming loose and that the paint was chipping off in the kitchen, indicating poor paint; that because thereof "we revarnished one floor and repapered a sun parlor." In describing the apartment wherein Schwenke complained of the paper he said: "The

way it looked to me, it was poor glue that they had used and poor paper." He referred to a time at least two weeks after the representations were made. Relative to this alleged representation Schwenke testified:

Q. "Well, you had some trouble with some snow getting on the roof there and melting, didn't you?

A. "Yes.

Q. "And that water ran down in and destroyed some of the paper?

A. "Yes.

Q. "And destroyed some of the varnish on the floor?

A. "No.

Q. "Well, it spoiled the decoration of the rooms, didn't it?

A. "Yes.

Q. "Now, that was after you had it, wasn't it?

A. "Yes.

Q. "And that was due to the snow on the roof melting on the roof?

A. "Yes.

Q. "Now, you are not blaming Mr. Sack for that, are you?

A. "No, but the roof leaked and I didn't know it.

Q. "Now, the roof leaked, you say? Snow was permitted to gather and accumulate there, wasn't it, on the roof? That is a flat roof, isn't it?

A. "Yes.

Q. "And as it melted and got off to the eaves it froze on the eaves, didn't it?

A. "Yes.

Q. "And that held the water there so that it stood on a flat roof?

A. "Yes.

Q. "That was the fact, wasn't it, Harry?

A. "Yes.

Q. "And on those flat roofs it is necessary to remove that snow or it will do damage on that roof?

Mr. Skahen: "Just a minute. That is objected to as argumentative.

The Court: "Sustained.

Mr. Spillane: "It probably is.

Q. "Well, now, there was a bathroom and the kitchen that you told us yesterday that needed some varnish?

A. "The bathroom needed some painting.

Q. "Some painting? Now, Mr. Sack told you that, didn't he?

A. "Yes.

Q. "And he told you that he had promised this tenant that he would refinish this bathroom and the kitchen?

A. "Yes.

Q. "And you agreed to do it at your own expense, didn't you?

A. "Yes.

Q. "And in consideration of your doing it didn't he turn over to you all the coal that he had in the flat?

A. "Yes."

Mrs. Schwenke testified that the woodwork in the kitchen was chipping off and that the tenants complained about the floors. She said the varnish on the floors was like gum and the rugs stuck to the varnish. She stated that some of the paper appeared as if damp and the glue would not stick. She spoke of the condition existing about six weeks after the representations were made. There is no proof of the conditions at the time when defendant made the representations. It would seem that the trouble was not due to wear and tear but apparently to the use of some defective or inefficient material, and the record does not disclose anything indicating that defendant had knowledge of this condition when he made the alleged representation. The trouble seems to have been superficial and of recent development. The evidence is indefinite as to the extent of the trouble both in area and cost of repairing. Upon the record as it is now before us the evidence in this particular is insufficient to substantially support the accusation.

■ The state's evidence is to the effect that the defendant represented his Minneapolis property hereinbefore mentioned to be worth $55,000. An owner, when trying to sell or trade his property, will naturally set a high value thereon. We all know that the tempta-

tion to get the most out of it is characteristic of human nature. Assertions of value under such circumstances cannot ordinarily constitute fraud because they are generally to be regarded as mere expressions of opinion or "trade talk" or "puffing" and involving a matter of judgment and estimation as to which men may differ. The rule is that such assertions do not amount to actionable fraud because it is natural for the seller to make extravagant claims and the purchaser to underestimate them. The law recognizes the human tendency to get the best of the bargain. It would render ordinary commercial transactions dangerous to hold that exaggerated expressions of value are actionable. There is also another reason why such statements of value do not as a rule constitute fraud, and that is that while the law does not look upon such conduct with favor, it will not encourage indolence and inattention by granting relief to those who suffer loss by reason of their own neglect. In Batchelder v. Stephenson, 150 Minn. 215, 216, 184 N. W. 852, the rule is thus stated:

"The well settled general rule is that an action of deceit cannot be predicated, under usual circumstances, upon a vendor's fraudulent misrepresentation of the value of the property sold. Men naturally exaggerate the value of what they own. They purposely exaggerate to induce a sale. The buyer knows this. He does not rely upon the vendor's statements of value under ordinary circumstances. The two deal at arm's length."

We have definitely held that where the parties deal at arm's length representations as to value afford no basis for a charge of fraud. Follingstad v. Syverson, 166 Minn. 457, 463, 208 N. W. 200, 203. It was therein stated:

"But from statements of value or quality, fraudulently made, where the vendee is in no position to ascertain value or quality, as where the property is distant, * * * or where advantage is taken of a personal or confidential relation, actionable fraud may be found."

In this case the property was located in Minneapolis. Schwenke lived in Waseca county, perhaps 100 miles distant. Defendant

lived in Lac qui Parle county, perhaps 200 miles distant. Schwenke saw the property. His examination thereof may have been limited. If so it was his own affair. The opportunity for examination and investigation was unlimited. Defendant was not present and he did nothing to prevent Schwenke from investigating and learning the true value. There was time enough. There was no deception in that respect. No artifice was used. There was no personal or confidential relation between them. Of course, as indicated and otherwise, there may be cases, exceptional to the general rule, wherein false representations of value may be actionable. Upon the record before us the general rule must control.

■ Schwenke desired to dispose of his property. He learned that one Jacobson was a real estate agent. He wrote Jacobson asking him to help him sell or trade his property. Jacobson came and saw him and his property. At the invitation of Jacobson, Schwenke went to Minneapolis to look at property for which he might deal. Jacobson, Schwenke and one Lund stopped at the Russell Hotel. They were there two days. They looked at several properties. On the second day they looked at defendant's property, and Jacobson told Schwenke that it was owned by a farmer at Boyd, where defendant lived, but that he did not know the price but would find out about it. Later Jacobson took defendant to Schwenke and the transaction was closed. Upon the trial the state, over the defendant's objection, showed that while these parties were in the hotel at Minneapolis Jacobson furnished intoxicating liquor which the parties drank. They had several drinks of alcohol. When Schwenke was asked if he got drunk he answered: "I don't know." He testified that Jacobson was not drunk but that he did not know whether Lund was drunk. He did state that on the day he looked at defendant's property he had not drunk any liquor until after looking at the property and that the drinking did not impair his ability to inspect the property.

Jacobson was Schwenke's agent. When the deal was closed defendant agreed to and did pay half of his compensation. Defendant was not present at the hotel. He was not then in Minneapolis. He had no connection with the liquor episode. We are at a loss to

see any theory upon which the evidence in relation thereto was admissible. It must have been used as a poisoned arrow toward defendant. Its offer and reception necessarily meant, as we view it, that it was to be understood that the responsibility for this conduct rested with defendant. But the record wholly fails to connect him with it. It seems that there was but one purpose and that was to have the jury draw the inference that defendant caused Jacobson to get Schwenke drunk so that he could be more easily overreached in a deliberate, premeditated and intentional plan to cheat him. In our opinion the reception of this evidence was prejudicial error.

■ The conduct of the county attorney and his assistant as set forth in appellant's brief on pages 46, 47, 48 and 49 is unfortunate. Seemingly counsel did not maintain that calm, fair and judicial attitude which is always commendable in a public prosecutor who seeks such conviction only as the evidence alone demands. Improper questions were asked. Insinuations were thrown out. Sarcastic remarks were made. None so very bad standing alone, but there were many. Taken together they may have an unfair influence and prevent a fair trial, which a prosecutor should strive to insure to a man, as a precedent to penal servitude. The prosecuting counsel must not forget that he always owes a duty to the accused. We will not discuss this assignment in detail, but we are reluctantly brought to the conclusion that counsel's conduct in this respect was erroneous in that it had a tendency to prejudice the rights of the defendant. There are other assignments of error involving questions which are not likely to arise in case of another trial, and it is unnecessary to consider them.

The judgment and sentence are vacated and the defendant is granted a new trial.